Alexis M. HERMAN, Secretary of Labor, United States Dept. of Labor, Plaintiff,

v.

THE REINECKE AGENCY d/b/a, Dealers Association Plan, Martin L. Vaughan, Doug Gibson, Dale W. Gessaman, Michael L. Kemper, Paul Holt, and James P. Ping, Defendants.

No. 94–1183–CIV–ORL–06(19).

United States District Court, M.D. Florida, Orlando Division.

Dec. 15, 1998.

Stanley E. Keen, Office of the Solicitor, United States Department of Labor, Atlanta, GA, for Plaintiff U.S. Dept. of Labor.

Andrew N. Gross, Slater, King & Gross, Atlanta, GA, for Defendants Gessaman, Kemper, Holt & Ping.

## MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOERGE C. YOUNG, Senior District Judge.

This case came before the Court for a bench trial in October, 1997. At the court's direction, counsel filed post-trial briefs and proposed findings of fact and conclusions of law. This court has carefully reviewed those post-trial documents, together with all of the evidence and pretrial pleadings, including reading all depositions filed with the court.

Previous court rulings in this case have disposed of the issues involving Defendant, Martin Vaughan, and Defendant, Dealers Association Plan. In addition, this Court has previously approved a settlement of all of the claims against Defendant, Doug Gibson. At the time of trial the remaining Defendants were Dale W. Gessaman, Michael L. Kemper, Paul Holt, and James P. Ping.

The issues left to be decided in this case involve the individual Defendants, Gessaman, Kemper, Holt and Ping *(the "Trustees")*, and their responsibilities in the operation and eventual failure of an employee health care plan which was provided to members of a used-car dealer association in Ohio. Plaintiff has charged each of the Trustees with breach of fiduciary duty in their positions as Trustees of the Miami Valley Automobile Dealers Association Health and Welfare Benefit Plan *(the "Plan")*. This plan was sponsored by the Miami Valley Automobile Dealers Association *(MVADA)*, of which each of the Defendants was a member. During its existence the Plan was administered by a third party, Dealers Association Plan *("DAP")*. Defendants argue that while they were in fact Trustees of the Plan that they were never "fiduciaries".

Jurisdiction in this court is pursuant to Section 502(e) and (f) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a) and (f). The Secretary of Labor seeks to enjoin acts and practices which violate the provisions of Title I of ERISA, and to obtain appropriate equitable relief to redress violations and enforce the provisions of that Title pursuant to Section 502(a)(2) and (5) of ERISA, 29 U.S.C. Section 1132(a)(2) and (5).

Plaintiff contends that Defendants, Gessaman, Kemper, Holt and Ping, the Trustees, failed to discharge their duties to the participants and beneficiaries of the Plan with the requisite degree of skill, prudence and diligence. Plaintiff further contends that the Trustees failed to act in accordance with the documents governing the operation of the Plan and that as a result they are each liable for the losses resulting from their breach of fiduciary duties, and that they are also liable for the breaches of their co-fiduciaries (Dealers Association Plan, Martin Vaughan and Douglas Gibson), in that by their failure to discharge their duties as Trustees, and specifically by their failure to monitor the activities of their co-fiduciaries, they enabled the co-fiduciaries to commit the breaches.

Section 3(21)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA") defines a person as a "fiduciary" with respect to a plan to the extent:

> "he exercises *any* discretionary control respecting management of such plan or exercises *any* authority or control respecting management or disposition of its assets . . ., or he has any discretionary authority or discretionary responsibility in the administration of such plan." (Emphasis supplied)

29 USC Section 1002(21)(A).

The Trustees deny that in their capacities as such they are fiduciaries.

## FINDINGS OF FACT

This Court finds that based on the facts of this case, the Trustees were in fact fiduciaries because they exercised the requisite degree of discretion and control to establish their fiduciary status. Furthermore, the Plan documents, combined with the ERISA laws, are sufficient to establish that the Trustees were fiduciaries to the Plan.

Defendant, Dealers Association Plan ("DAP"), a now defunct Florida corporation, was founded in late 1977 by Martin L. Vaughan, together with others, and was formerly known as the Reinecke Agency. DAP was a professional third-party administrator located in Orlando, Florida. Defendant Martin L. Vaughan, was the chief operating officer and director of DAP, and was the decision maker within DAP on a day-to-day basis. Defendant, Douglas Gibson, was a senior responsible employee of DAP, managing its day-to-day operations until DAP's termination.

DAP promoted its expertise in the implementation and administration of employee welfare benefit plans providing for the health benefits of employees in the automotive sales and service sector, and related automotive enterprises. DAP marketed a health benefits plan to various automobile dealer associations, including The Miami Valley Automobile Dealers Association ("the MVADA"), which is a trade and lobbying association for used car dealers in the Miami Valley region of Ohio.

The plan developed for sponsorship by the Association was the Miami Valley Automobile Dealers Association Health and Welfare Benefit Plan ("the Plan"). The Plan was established effective November 14, 1984, as a partially self-funded welfare benefit plan. DAP served as third party Administrator throughout the life of the Plan. DAP prepared and presented all Plan documents to the Association for their execution and subsequent implementation by DAP.

From 1978 until 1986, DAP organized, implemented, acquired, marketed and maintained at least twelve multiple employer welfare arrangements ("MEWAs"), including the Miami Valley Plan. The plans, plan documents and administration procedures were nearly identical in all instances. DAP was a named fiduciary and served as the third-party administrator for all of them.

During the 1990's each of the MEWAs implemented and/or administered by DAP eventually failed, leaving over $1,200,000 in unpaid claims. The MVADA Health and Welfare Benefit Plan ceased paying its claims in late 1991, and at the time of its failure, left approximately $215,000 in unpaid claims.

Defendants, Dale Gessaman, Michael L. Kemper and Paul Holt were named Trustees of the Plan from its inception until their resignations in November 1991. Defendant, James P. Ping was a named trustee of the Plan from late 1987 until his resignation in November 1991. As trustees for the Plan, each of these defendants were fiduciaries with respect to the Plan.

The Plan Trust Documents gave the Trustees discretion and control over the assets and the administration of the Plan and set forth specific duties, powers and authority.

## DISCUSSION

Plaintiff has alleged that the Trustees breached their fiduciary duties in several respects in that they:

(1) failed to investigate the credentials of DAP and its principals;

(2) improperly delegated their responsibility to manage the assets of the Plan to the Plan Administrator;

(3) failed to monitor the activities of DAP;

(4) did not fully understand the only financial reports upon which they relied to operate the Plan;

(5) failed to maintain control over the administrative costs of the Plan;

(6) failed to set proper premium rates for the Plan;

(7) knew or should have known that the underwriting guidelines of the Plan were not being enforced;

(8) failed to collect contributions as required by the Plan documents;

(9) failed to maintain asset reserves sufficient to meet the financial obligations of the Plan; and

(10) were not bonded.

This court will briefly discuss these items.

***Failure to investigate the credentials of DAP and its principals; improperly delegating their responsibility to manage the assets of the Plan to the Plan Administrator; and failure to monitor the activities of DAP:*** Paul Holt, Michael Kemper, Dale Gessaman and Paul Cloudt (deceased before commencement of this litigation), as representatives of the Association, were volunteer members of a committee to select a health insurance plan. They learned that the Florida Dealer Association had a good quality hospitalization plan with DAP as administrator, and that there had been no complaints. This information was confirmed by a number of Florida dealers, who indicated that their plan was doing well and recommended it without reservations. The Association also learned that DAP was the administrator of other similar plans, about none of which any complaints were noted.

The premium rates for the DAP plan were compared to those of Blue Cross/Blue Shield and Nationwide Insurance Company (previous health insurance providers to MVADA), and alternatives suggested by the Milliken–Williams Insurance Agency in New Carlisle, Ohio, in order to compare the cost of similar coverage and to confirm the sufficiency of the DAP. The cost of comparable insurance exceeded the cost of the Plan offered by DAP. The DAP Plan seemed to be a cost effective alternative. Based on a comparison with the health insurance costs of other automobile dealers who were not in this plan, the

rates for this plan seemed competitive, but not suspect.

Based on their investigation, the Trustees chose the Plan involved in this case and elected to use DAP as the administrator since there had been no problems in the other DAP-run plans. It would appear from the record that adequate investigation was made into the selection of a plan, but that the investigation could have gone farther into the management credentials of the third-party administrator, DAP.

The Plan documents prepared by DAP and provided to the Trustees consisted of an Agreement and Declaration of Trust, an Administrator Agreement, a booklet describing plan benefits entitled "Employee Benefit Plan, Miami Valley Independent Automobile Dealers Association", and an Employer Agreement and Subscription to the Association Master Trust.

Section 4.9 of the Plan Agreement and Declaration of Trust document required:

> "The Trustees and any other party serving as fiduciary with respect to the Plan shall act prudently in the delegation or allocation of responsibilities to other persons, and each Trustee shall exercise reasonable care to prevent the other Trustees from committing a breach of such other Trustee's obligations and responsibilities hereunder. Each Trustee shall conduct a periodic review to assure that delegated functions are carried our properly...."

Other than relying on the word of other dealer association groups, the record is void of any independent investigation conducted by the Trustees into the selection of a third party administrator to operate the Plan chosen. It is true that the Trustees failed to check into either the leadership of DAP and/or Martin Vaughan to ascertain whether DAP was sufficiently capable of administering the responsibilities necessarily involved in maintaining such a Plan. This Court is of the opinion that these Defendants made the best effective effort they could have made based on their

experience in this area and with the limitations of their insurable group.

DAP was responsible for administering the daily business of the MVADA Plan, which it carried out entirely in Orlando, Florida, where it kept all of the Plan's books, records and bank accounts. The Trustees delegated all day-to-day responsibility for the operation of the Plan to DAP but made efforts to follow what was happening to the payment of claims and management of the premiums collected.

The record shows that DAP was required to receive, verify and pay all valid claims, and to establish and execute the procedure for doing so. It established and implemented the premium rates and underwriting guidelines, the level of asset reserves, enrollment of plan participants, and other participant decisions. DAP billed for and collected all premiums from the subscribing employers, and made all deposits and disbursements. It employed agents to market the MVADA Plan to members of the employer association. DAP selected and retained the underwriter and/or stop loss carriers for insurance. It executed all necessary documents for the administration and operation of the Plan.

Section 4.1 of the Plan Agreement and Declaration of Trust document specifically provides:

> "The Fund shall be managed, invested and reinvested by the Trustees, subject, however, to the right of the Trustees to employ an investment manager or managers to manage and/or invest and reinvest the Fund ... Any such investment manager so employed must meet the definition thereof contained in Section 3(38) of the Employee Retirement Income Security Act of 1974...."

At the time of this case, the applicable definition of "investment manager" was set forth in Section 3(38) of ERISA as follows:

> The term 'investment manager' means any fiduciary (other than a trustee or a named fiduciary...)—

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who is (i) registered as an investment advisor under the Investment Advisors Act of 1940 [15 USCS Section 80b–1 et seq.]; (ii) is a bank, as defined in that Act [15 USCS Section 80b–1 et seq.]; or (iii) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than ones State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

29 U.S.C. Section 1002(38).

There is no evidence in the record to show that DAP was either a registered investment advisor, a bank, or an insurance company. It would appear that the Trustees relied entirely on DAP without question as to all aspects of the day-to-day operation of the Plan. As stated above, DAP had total responsibility for receipt, deposit and management of all premiums, including where to invest the funds and in what method; when to move funds and how much money to move at any given time. There is no indication in the record that any of the Trustees even had signing authority for check writing purposes. While all of these duties were handled by DAP, there is evidence in the record to show that the Trustees did follow through on complaints, that they reviewed the monthly statements and discussed various aspects of the Plan at regular meetings.

Section 3.3(b) of the Plan Agreement and Declaration of Trust document provided:

> "All funds received by the Trustees hereunder as part of the Fund shall be deposited by them in such bank or banks as the Trustees may designate for the purpose and all withdrawals of funds from such bank or banks shall be made only by check signed by a person or persons authorized by the Trustees to sign and/or countersign."

DAP made decisions on which claims to pay and when. The Trustees would call DAP when they received a complaint about slow payment and they attempted to review regular monthly statements.

***Failure to fully understand the financial reports upon which they relief to operate the Plan; failure to maintain control over the administrative costs of the Plan; and failure to set proper premium rates for the Plan:***

The Trustees reviewed monthly reports prepared for them by DAP. All of the Trustees testified that they understood from the monthly reports when the plan began to experience financial trouble, and further testified about the efforts they undertook to solve the problem. The reports described the source and application of Plan funds on a month by month basis. For each month, the report showed all information necessary for the trustees to make informed judgments about the status of the Plan. Each line entry showed health premiums collected during the particular month, as well as an amounts paid out of plan assets during that same month for administrative costs, reinsurance premiums, and claims paid. Also shown were the numbers of active participating employers and employees, and some other useful but nonessential information.

Except for James Ping, every trustee was able to adequately and correctly explain each of the line item entries, and to further demonstrate his understanding of how to interpret them. Mr. Ping acknowledged his inability to comprehend the reports, but he testified that he gave them to his accountant for review and comment, and that his accountant expressed concern for him to follow through with the other trustees and DAP about problems with the asset reserves and the declining financial condition. Based on the evidence at trial, this Court concludes that none of the Trustees sought additional financial information from the administrator nor did they ask for an accounting of all of the Plan's funds.

Until the last years of the Plan, the monthly reports appeared to show that the Plan was operating satisfactorily. The monthly reports introduced by the Department of Labor only provided information from February 1989 through October 1991—the end stage of the Plan, when the Plan was experiencing serious financial difficulties.

None of the Trustees were practicing accountants or had any particular specialized training in accounting. However, when it became apparent that the Plan was failing, the Trustees belatedly attempted to take remedial steps to correct the problem. The trustees sought effective alternative coverage, but had little success because of their small number of insured and because of members with preexisting medical conditions which made changing plans extremely difficult. While the record does not show that the Trustees sought a different plan administrator, they did seek alternative health plans.

Section 4.2 of the Plan Agreement and Declaration of Trust document provides in part:

> "The Trustees shall have the power to take such action and execute such documents with respect to the Plan, . . . as they may deem necessary or advisable in order to carry out the purposes for which the Plan is established and operated, including without limitation the right to limit, suspend or revoke the authority, duties and obligations of the Administrator appointed and serving . . ."

The trustees engaged in periodic comparison of the Plan's coverage and costs of alternative coverage by other providers. Their inquiries to other health plans and insurance providers were not successful. Trustees Dale Gessaman and Paul Holt contacted insurance agents for costs of replacement coverage, and also contacted other automobile dealers to determine and compare what they were paying for coverage. The Trustees were often contacted on behalf of alternative health coverage

**1344**

providers, surveys of the membership were conducted and presentations for coverage made. No offers of presentation for replacement coverage were ever declined. The presentations were almost monthly. Upon surveying the membership, however, the presenters would either decline to offer coverage, or offered coverage at a substantially higher cost than or with fewer benefits than the DAP plan.

It is clear from the evidence that the reason the Plan failed was that it was not collecting enough premiums to cover claims and expenses. At the time of its failure, there were thirty-eight (38) dealers enrolled in the Plan, with only sixty-seven (67) members insured. DAP calculated and recommended proposed rate increases to the Trustees, but the Trustees were concerned about increasing rates too high for Association members to accept. The Trustees correctly understood that rate increases would cause the Plan to lose participants, and leave only the least healthy employees enrolled. Loss of participants was already a problem, and increasing the premium rates would exacerbate the problem.

There were at least two rate increases during the period of time that the Plan was in existence, and each time member participation dropped. Because of this fact, the Trustees were reluctant to increase rates again, and risk having no coverage for some member participants who would have difficulty finding other health coverage. However, the failure to increase premiums eventually led to the failure of the Plan. The premium rates and asset reserves for the Plan were never sufficient to accommodate its expected benefits and other expenses.

DAP was charging a twenty percent administrative fee to manage the Plan, together with billing fees and delinquent fees from employers and commissions on the sale of life insurance. All of these administrative costs contributed to the lack of funds available to pay claims. Despite the authority to do so, the Trustees did not request that the administrative fee be lowered or eliminated temporarily in an effort to make more money available to pay valid claims.

Nor did the Trustees compare the DAP administrative costs to those charged by other plans. In fact, the evidence showed that none of the Trustees was fully aware of the total compensation received by DAP. But reduction of DAP's fees alone would not have saved this plan.

Neither the Trustees nor DAP commissioned or prepared plan-specific actuarial studies. Plan-specific actuary information would likely have resulted in a recommendation that rates be increased. It was already established that too few employees were covered by this plan to make any premium increase a viable course of action.

The Plaintiff further contends that the Trustees failed to follow the Plan's requirement that they provide the Association with quarterly reports of the Plan's financial condition. The record reflects that the only reports that were even distributed were the monthly reports that the Trustees received.

Section 6.2 of the Plan Agreement and Declaration of Trust document provides in pertinent part that the Administrator:

" . . . shall assist under the supervision of the Trustees in the preparation and filing of reports, returns or other documents required by a governmental agency or authority; . . . "

The 5500 returns required by the federal government were filed with the Internal Revenue Service but the Defendants were not aware of the filings until preparation for trial. Awareness of the contents of the returns should have alerted the Trustees to the negative cash flow of the Plan.

***Failure to know that the underwriting guidelines were not being enforced:***

The Plan Employer Agreement set forth the following underwriting guidelines:

"In firms of ten (10) or more full-time . . . employees, seventy-five percent (75%) of those employees eligible must

be enrolled. 5–10 employees 100% of eligible employees less 1, in firms of less than five (5) full-time employees, one hundred percent (100%) of those employees eligible must enroll."

The evidence at trial was that at least one of the Trustees had notice that the underwriting guidelines were not being enforced because his own company was in violation of the underwriting guidelines. As stated above, at the time of its failure, the Plan covered 38 subscriber employers and only 67 subscriber employees so that such violation was a contributing cause to the Plan's ultimate demise.

***Failure to collect contributions as required by the Plan documents and failure to maintain asset reserves sufficient to meet the financial obligations of the Plan and failure to be bonded:***

Section 4.3 of the Plan Agreement and Declaration of Trust document provides:

"The Trustees shall have the power to demand, collect and receive Association and/or Employee contributions as and when same shall become due and payable, to make any authorized refunds or adjustments thereof, and to hold, invest and reinvest and pay same as a part of the Fund in accordance with the purposes herein specified."

Furthermore, in the event that contributions were insufficient to cover the benefits payable under the Plan, the Trustees had the power to seek contributions from the participants to cover the deficiency.

Section 3.3(a) of the Plan Agreement and Declaration of Trust document provides:

"The Fund shall be funded with contributions made by the Member Employers and Employees at such intervals and in such amounts and manner, through payroll deductions or otherwise .... In the event and to the extent such contributions are not sufficient from time to time to cover the benefits payable under the Plan and other payments from the Fund authorized ... all plan participants shall contribute or cause to [be] paid to the Fund such amount or

amounts as may be necessary to cover the deficiency."

The evidence shows that while they were Trustees, none of the Trustees ever made an attempt to assess contributions from the participants in order to cover the deficiency. The record does show that after the Trustees resigned in November 1991, they attempted to assess the dealer members but that no one responded and not one dollar was collected—nor did any of the Trustees themselves make a contribution. Hence the Trustees breached a fiduciary duty which was essential to the success of the Plan.

***Failure to maintain assets reserves sufficient to meet the financial obligations of the Plan:*** Section 3.2(b) of the Plan Agreement and Declaration of Trust document provides that the Trustees may also use and apply the Fund for the following purposes:

"To establish and accumulate as part of the Fund an adequate reserve to carry out the purpose of the Trust."

Further, the Administrator Agreement executed by the Trustees simultaneously with the Declaration of Trust Agreement on November 14, 1984, required the Administrator "to make monthly demand of the Trustee for such funds, in the fund accrual reserve, as shall be prudently required for payment of Member Plan claims." At the time of the failure of the Plan there were insufficient asset reserves to pay outstanding claims. Throughout the existence of the Plan, the Trustees, by delegation, relied on the administrator to handle the asset reserve fund. Again the Trustees failed in their duty to provide essential funds.

***Trustees failure to be bonded:*** Section 4.11 of the Plan Agreement and Declaration of Trust document provides:

"Each Trustee, the Administrator appointed ... and any other party at any time serving as a fiduciary with respect to the Plan shall be bonded pursuant to the Act Section 412 in an amount which

shall not be less than ten percent (10%) of the amount of the Fund, but in no event shall such bond be less than One Thousand Dollars ($1,000.00) nor more than Five Hundred Thousand Dollars ($500,000.00). The Trustee shall be bonded in accordance with the foregoing requirement within (30) days of the acceptance of their duties...."

There is no evidence to show that the Trustees were ever bonded nor is there evidence showing that they inquired of DAP or any person associated with DAP whether they were bonded under the Plan. Under their fiduciary responsibilities, the Trustees had an obligation to fulfill this bonding requirement.

## DAMAGES

The Plan ceased paying its claims in November, 1991. At the time the Plan ceased operations there were valid unpaid health care claims in the amount of $215,354.53.

This Court holds that since this Plan was never in a truly healthy operating condition because of the low membership participation and low premium collections, it is unreasonable to find that any excess funds would have existed in the fund on which any additional earnings would have accrued.

## CONCLUSION

█ Based on an analysis of the facts which I find from the evidence adduced at trial, I conclude that as a matter of law the Defendants are individually and severally liable for such losses as may now remain from the claims unpaid at the time of the Plan's termination. It is with reluctance that I make this conclusion because the Trustees were victims of their own layman's ignorance of the law's requirements. Some supervision or initial warnings by the Department of Labor might have prevented the trap in which the Trustees fell and thus avoided the losses to the beneficiaries.

The Plaintiff and the Defendants will jointly endeavor to ascertain within sixty (60) days from date hereof what remaining claims are still unpaid and thereafter promptly advise the Court so that an appropriate Judgment may be entered.